## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| GEORGE HOKIT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-12-140-SPS |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the Social | ) | |
| Security Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

The claimant George Hokit requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). He appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining he was not disabled. For the reasons discussed below, the Commissioner's decision is hereby REVERSED and the case is REMANDED to the ALJ for further proceedings.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Ms. Colvin is substituted for Michael J. Astrue as the Defendant in this action.

severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Sec'y of Health & Human Svcs.*, 933 F.2d 799, 800 (10th

---

[2]Step One requires the claimant to establish that he is not engaged in substantial gainful activity. Step Two requires the claimant to establish that he has a medically severe impairment (or combination of impairments) that significantly limits his ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or his impairment *is not* medically severe, disability benefits are denied. If he *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, he is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that he lacks the residual functional capacity ("RFC") to return to his past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given his age, education, work experience, and RFC. Disability benefits are denied if the claimant can return to any of his past relevant work or if his RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

Cir. 1991).  But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

### Claimant's Background

The claimant was born September 3, 1958, and was fifty-two years old at the time of the administrative hearing.  (Tr. 26, 109).  He completed high school and earned a college degree, and has worked as yard laborer, dishwasher, electrician helper, and a housekeeper.  (Tr. 44-45, 151).  He alleges that he has been disabled since June 3, 1980, due to a mental condition.  (Tr. 146).

### Procedural History

On December 30, 2008, the claimant filed for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85.  His applications were denied.  ALJ Osly F. Deramus held an administrative hearing and determined the claimant was not disabled in a written opinion dated August 24, 2010.  (Tr. 10-20).  The Appeals Council denied review, so the ALJ's written opinion represents the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. §§ 404.981, 416.1481.

### Decision of the Administrative Law Judge

The ALJ made his decision at step four of the sequential evaluation.  He found that the claimant could perform a full range of work at all exertional levels, but that he had the

following nonexertional limitations due to psychologically-based factors: could understand, remember, and carry out simple and some detailed instructions; could sustain concentration and persistence for extended periods of time; is able to interact with supervisors, coworkers, and the general public; and is able to adapt to changes in a normal workplace setting. (Tr. 13). The ALJ thus concluded that the claimant could return to his past relevant work as a yard laborer, dishwasher, electrician helper, and housekeeper. (Tr. 20).

## Review

The claimant contends that the ALJ erred: (i) by failing to consider the claimant's mental impairments under Listings 12.02, 12.03, and 12.04; (ii) by failing to properly consider the opinions of the claimant's treating physicians, Dr. Ed Ellis and Dr. Herbert Rowland; (iii) by improperly picking and choosing evidence; (iv) by failing to properly evaluate his credibility; (v) by failing to properly consider the mental demands of the claimant's past work; (vi) by failing to obtain further psychiatric evaluation, including IQ testing; and (vii) by failing to conduct a proper pain analysis. The Court finds the claimant's third and fourth contentions persuasive for the following reasons.

The relevant medical evidence reveals that the claimant suffered a closed head injury in June 1980 when he was in a motor vehicle accident, shortly after graduating college with a degree in banking and finance. (Tr. 213, 327). Although the medical records from the accident, and the ensuing multiple facial reconstruction surgeries, are not a part of the record, they are mentioned several times in the record. (Tr. 213, 237-238, 307, 327). Dr. George Prigatano, a neuropsychologist, conducted a

neuropsychological examination of the claimant on September 15-16, 1980, to provide the claimant's treating physician with a determination as to his higher cerebral functioning and prognosis.  (Tr. 213).  Dr. Prigatano found that the claimant showed no gross signs of disturbances, had no major problems in sustaining attention or concentration, and had a good ability to shift cognitive set.  (Tr. 213).    Perceptual functioning was also within normal limits, and the Wechsler Adult Intelligence Scale was "quite variable," showing a prorated Verbal IQ of 89, a prorated Performance IQ of 98, and a prorated Full Scale IQ of 92.  (Tr. 214).  Dr. Prigatano noted that these scores strongly suggested impairment in verbal reasoning and verbal skills in light of his recent academic history, and that his new learning ability was impaired relative to what would be expected in a man his age.  (Tr. 214).  Dr. Prigatano's opinion was that the claimant's overall impairment rating was in the mild range, but that his test performance revealed a "a great deal of variability in various cognitive and perceptual motor areas."  (Tr. 214). He concluded that, at that time, the claimant would have difficulty in continuing with college work (as had been his plan prior to the accident), but that he "may be able to sail through college work within another 3 or 4 months, but he will probably need to be re-examined prior to that in order to be sure."  (Tr. 214).  Dr. Prigatano recommended physical therapy, as well as academic work on his own to prepare for returning to college, and that he be provided with support for the subtle deficits that he believed would be minimal in the future, but cautioning, "How minimal they will be, of course, cannot be clearly determined, but I suspect he will get back to normal functioning within a year." (Tr. 215).  On February 9, 1998, Dr. Rowland sent a letter "To Whom it May Concern,"

stating that the claimant had developed a perceptive disorder since his motor vehicle accident and had been unable to function in society and only recently obtained a job scrubbing floors at the hospital.  In support, he stated that the claimant was inappropriate in his thought processes and was basically unable to function in society due to severe limitations relevant to his central nervous system damage.  Additionally, Dr. Rowland questioned whether the claimant knew right from wrong or had the ability to make decisions for his daily living.  (Tr. 216).

The record is largely void of medical evidence as to the claimant's impairments until 2002.  As to his physical impairments, the claimant was treated at various times for heat exposure, as well as received treatment for an abscess on his arm while he was in the care of the Oklahoma Department of Corrections.  (Tr. 237, 276-277).

On February 23, 2009, Kathleen Ward, Ph.D., conducted a consultative mental status examination of the claimant.  She noted that he had been hospitalized for psychiatric reasons in 1984-1985, and that he had been arrested and/or incarcerated for marijuana charges on three or four occasions.  (Tr. 308).  She noted that his speech was slow and mildly slurred, but cohesive although he became hostile when he was asked to clarify statements.  (Tr. 308).  She further noted that he appeared to have some deficits in social judgment and problem solving, and that he would be incompetent to handle funds because he reported money problems as a barrier to getting as much marijuana as he wanted.  (Tr. 309).   The following month, a state reviewing physician found that the claimant only had mild functional limitations, and assessed him with cannabis dependences v. abuse and antisocial traits.  (Tr. 322-324).  The claimant had a treatment

relationship with the Pushmataha Family Medical Center, where Dr. Rowland and Dr. Ellis practiced.  Additionally, Dr. Ellis referred the claimant to Dr. C. Don McKinney, L.C.S.W., also part of the same practice.  (Tr. 328).  Dr. Ellis completed a Mental Functional Assessment Questionnaire on May 26, 2009, stating that he was treating the claimant for a mental condition that imposed more than minimal limitations.  (Tr. 327). He diagnosed the claimant with dementia due to other general medical conditions and a closed head injury from 1980, stating in support that the claimant had an impaired ability to learn new information or recall previously learned information, and that he had limited cognitive processing abilities, *i. e.*, disturbance in executive functioning, planning/organizing/abstracting.  He indicated that these impairments did not allow the claimant to prepare for or participate in structured environments, such that school and employment were not available options for him.  (Tr. 327).  At Dr. McKinney's initial assessment of the claimant a month earlier, he assessed the claimant with a Global Assessment of Functioning Score (GAF) of 40, and estimated that 40 had been his highest GAF in the past year.  (Tr. 332).  A week later, he assessed the claimant with a GAF of 45.  (Tr. 336).  On September 16, 2009, Dr. Ed Ellis completed a MSS of the claimant's ability to do work (mental).  He found that the claimant had an extreme limitation in the ability to understand and remember detailed instructions, and a marked limitation in the ability to maintain attention and concentration for extended periods in order to perform detailed tasks, and in the ability to accept instructions and criticism from supervisors.  Additionally, he noted moderate limitations in the ability to remember locations and work-like procedures, the ability to maintain attention and concentration for

-7-

extended periods in order to perform simple tasks, and the ability to interact appropriately with the public.  He notes slight limitations in all other areas.  (Tr. 345).  He referenced the claimant's 1980 motor vehicle accident as the source for these limitations, stating that he has been treating the claimant for 29 years, and that he has had limited mental functioning since that time and had had to relearn simple functions.   (Tr. 344-346).  Additionally, he checked 15 signs and symptoms that were a result of the claimant's mental impairment, and remarked that the claimant had been unable to hold a job for three years, had worked as a janitor for a short time, and that his driver's license had been void for two years.  (Tr. 346).  Dr. Elllis saw the claimant on February 1, 2010, for sinusitis, and noted that the claimant was disabled for employment mostly due to brain dysfunction and personality change since his 1980 motor vehicle accident.  (Tr. 348).

At the administrative hearing, the claimant testified that he had a job doing yard clean-up in 2007, but that he was fired when he was arrested for possession of marijuana.  (Tr. 26-27).  He testified that he lived with his mother and had essentially never left home, that his mother brought him to the hearing because his driver's license had been suspended, and that he still smokes marijuana.  (Tr. 28-29).  He further testified that Dr. Rowland and Dr. Ellis had treated him since his 1980 motor vehicle accident, and that he agreed with Dr. Ellis that he had an impaired brain function because he graduated from college at the age of 21, but had been "shot out of a saddle and never got back on the horse."  (Tr. 31-32).  He testified that despite Dr. Prigatano's assessment that he would eventually recover, he never had, and that residual side effects included continued problems with his left side, lower back pain, and trouble remembering things to the point

-8-

he would have to be reminded of things over and over again.  (Tr. 33-35).  He stated that he takes his dog out for walks, that he can stand unassisted, that he thought he could lift thirty or forty pounds occasionally, and that he helps with housework at home.  (Tr. 36-37).  The claimant's mother also testified at the hearing that she was seventy-three years old and worked as a home health nurse, that to her knowledge he began to do drugs after his accident to feel functional and acceptable with his friends, that she had asked her supervisor at the hospital to give her son the housekeeping job, and that her brother had taken him on jobs as an electrician's assistant.  (Tr. 39-41).  She stated that he needs very close supervision when working on a job and at the house, because he had left fires burning while cooking and does not remember where dishes go.  (Tr. 42-43).

The ALJ summarized the claimant's allegations of impairment, then stated, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (Tr. 14).  The ALJ then summarized the medical evidence, including the claimant's mother's testimony and the claimant's job history in which he admitted he was fired several times for drug possession.  (Tr. 14-20).  He then concluded that the claimant's limited daily activities could not be verified with a reasonable certainty, and stated that it was difficult to attribute the impairments to his medical condition rather than his cannabis dependence.  (Tr. 19).  He also disregarded the claimant's mother's testimony because she could not determine which behaviors were the

result of a medical condition or a lifestyle choice, and stated that her testimony was outweighed by other (undisclosed) factors. (Tr. 19). He then concluded that the claimant was not a credible witness because (i) the medical evidence did not support his claims, (ii) the 1980 report predicting a full recovery, (iii) the lack of significant findings on examination, (iv) the claimant's lack of mental health treatment, (v) the claimant's demeanor at the hearing and discrepancies between his allegations and his self-reported work history. (Tr. 19-20). Furthermore, the ALJ rejected Dr. Ellis's opinion because he (incorrectly) believed that Dr. Ellis did not have a longitudinal relationship with the claimant, and also failed to mention much less discuss the GAF scores contained in the record. (Tr. 17-19). He rejected the opinions of all of the doctors from the Pushmataha Family Medical Center because they treated him sporadically and noted that he needed a disability evaluation because he was trying to get benefits "if indicated," and they were not specialists. (Tr. 18).

Deference is generally given to an ALJ's credibility determination, unless there is an indication that the ALJ misread the medical evidence taken as a whole. *See Casias*, 933 F.2d at 801. In assessing a claimant's complaints of pain, an ALJ may disregard a claimant's subjective complaints if unsupported by any clinical findings. *See Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987). But credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) [quotation omitted]. A credibility analysis "must contain 'specific reasons' for a credibility finding; the ALJ may not simply 'recite the factors that are described in the regulations.'" *Hardman v.*

*Barnhart*, 362 F.3d 676, 678 (10th Cir. 2004), *quoting* Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4 (July 2, 1996).   The ALJ's credibility determination fell below these standards.

First, the ALJ mentioned but did not discuss the credibility factors set forth in Social Security Ruling 96-7p and 20 C.F.R. §§ 404.1529, 416.929, and further failed to apply them to the evidence.[3]   He was not required to perform a "formalistic factor-by-factor recitation of the evidence[,]" *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000), but "simply 'recit[ing] the factors'" is insufficient, *Hardman*, 362 F.3d at 678, *quoting* Soc. Sec. Rul. 96-7p, 1996 WL 374186 at *4, and the ALJ did not even do that.

Second, the comment that "[t]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" showed an improper approach to credibility.   The ALJ should have *first* evaluated the claimant's credibility according to the above guidelines and only *then* formulated an appropriate RFC, not the other way around; instead, the ALJ apparently judged the claimant's credibility according to an already-determined RFC.   *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (in addressing nearly identical language, "[T]he passage implies that ability to work is determined first and is then used to determine the claimant's credibility.   That gets things backwards.   The administrative law judge based his conclusion that Bjornson

---

[3]   The factors to consider in assessing a claimant's credibility are:  (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken; (5) treatment for pain relief aside from medication; (6) any other measures the claimant uses or has used to relieve pain or other symptoms; (7) any other factors concerning functional limitations.  Soc. Sec. Rul. 96-7p at *3, 1996 WL 374186 (July 2, 1996).

can do sedentary work on his determination that she was exaggerating the severity of her headaches. Doubts about credibility were thus critical to his assessment of ability to work, yet the boilerplate implies that the determination of credibility is deferred until ability to work is assessed without regard to credibility, even though it often can't be."). *See also Hardman*, 362 F.3d at 679 ("[B]oilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible."), *citing Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001).

Last, the specific reasons given by the ALJ for finding that the claimant's subjective complaints were not credible are not entirely supported by the record. The ALJ ignored the claimant's long-time treating physician's reports that the claimant's closed head injury following his motor vehicle accident had altered his ability to do work. Further examination of "perceived" inconsistencies indicates that the ALJ only cited evidence favorable to his foregone conclusions and ignored evidence that did not support his conclusions. *See Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."), *citing Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984). *See also Taylor v. Schweiker*, 739 F.2d 1240, 1243 (7th Cir. 1984) ("'[A]n ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion.'"), *quoting Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982). This is bolstered by the fact that the ALJ wholly ignored the GAF scores in the record

ranging from 40 to 45.  (Tr. 332, 336).  "[A] GAF score between 41 and 50 indicates [s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e. g., no friends, inability to keep a job)."  *Lee v. Barnhart*, 117 Fed. Appx. 674, 678 (10th Cir. 2004) [quotation omitted] [unpublished opinion].  "Although the GAF rating may indicate problems that do not necessarily relate to the ability to hold a job," *Oslin v. Barnhart*, 69 Fed. Appx. 942, 947 (10th Cir. 2003) [unpublished opinion], "[a] GAF score of fifty or less . . . *does* suggest an inability to keep a job." *Lee*, 117 Fed. Appx. at 678 [emphasis added], *citing Oslin*, 69 Fed. Appx. at 947.  The ALJ should have considered whether the claimant's substandard GAF scores were due to occupational factors.  *See, e. g., Givens v. Astrue*, 251 Fed. Appx. 561, 567 n.4 (10th Cir. 2007) (noting that "the Commissioner argues that a low GAF score may indicate problems that do not necessarily relate to the ability to hold a job[,]" but finding that "[e]ven assuming this is true, the ALJ's decision does not indicate he reached the conclusion that Ms. Givens' low GAF score was due to non-occupationally-related factors.") [quotation marks omitted] [unpublished opinion].  Instead, the ALJ wholly ignored evidence that did not support his conclusion.  *Taylor v. Schweiker*, 739 F.2d 1240, 1243 (7th Cir. 1984) ("'[A]n ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion.'"), *quoting Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982).

Because the ALJ failed to properly analyze the claimant's credibility in accordance with *Kepler* and *Hardman*, the decision of the Commissioner must be reversed and the case remanded to the ALJ for further analysis.  Also, the ALJ should

properly analyze whether the claimant's substandard GAF scores reflected occupational limitations; if such analysis results in any adjustments to the claimant's RFC, the ALJ should re-determine what work the claimant can perform, if any, and ultimately whether he is disabled.

### Conclusion

In summary, the Court FINDS that correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence. The Commissioner's decision is accordingly REVERSED and the case REMANDED for further proceedings consistent herewith.

**DATED** this 25th day of September, 2013.

Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma